Beckering, J. (concurring in part and dissenting in part).
One of our most treasured rights as adults is the freedom of association: the ability to spend time with whatever group or person we desire. But what happens when we are no longer cognitively able to discern for ourselves who is a friend and who is a foe, even though both may be sweet and endearing? This case is about the propriety of a personal protection order (PPO) issued against respondent, Michael Rudy, to protect petitioner, Kay Windram Brown, from her own vulnerability to manipulation and exploitation due to Alzheimer's disease. At issue is whether the trial court erred by continuing the PPO after hearing three days of testimony from a host of witnesses, including Brown, Rudy, and Brown's coguardian and conservator, Joelle Gurnoe.
In response to the issues Rudy has raised on appeal, the majority concludes that the trial court correctly held that Gurnoe had the requisite legal authority to petition for a PPO on behalf of Brown. On that point I agree. But the majority sides with Rudy on his argument that the trial court should have granted his motion to discontinue the PPO. While I agree that the trial court erred by issuing its October 14, 2016 order, I do so only because the trial court failed to make findings of fact necessary to determine whether Gurnoe, on behalf of Brown, had met her burden of proof in establishing a right to continue the PPO pursuant to MCL 600.2950. A remand is necessary for the trial court to make those factual findings. For this Court to rule in favor of either party on the ultimate question of whether the trial court should have continued the PPO would require wading into witness credibility and fact-finding, neither of which is the proper function of this Court. I dissent from the majority opinion because I would vacate the trial court's order and remand for further proceedings.
I. BASIC FACTS AND PROCEDURAL HISTORY
Kay Brown was 75 years old at the time of the PPO evidentiary hearing. She is a wealthy widow who, while bright and vivacious throughout her lifetime, is suffering *925 from the progressive effects of Alzheimer's disease and has been exploited in the past by others. Michael Rudy was 71 years old at the time of the PPO evidentiary hearing. He holds himself out to be a financial planner, psychotherapist, and psychoanalyst. Rudy and Brown met at some point in the 1980s, but they did not have any significant contact or relationship until they became reacquainted in the fall of 2014 through a woman named Kathleen Baxter. When Rudy gave Brown a ride to North Carolina so that he could attend a conference and she could visit her grandchildren, Rudy discovered documents Brown had brought with her revealing her financial worth. After making several unsuccessful attempts to become her financial advisor, Rudy engaged in a dating relationship with Brown.
Before the instant proceedings commenced, Brown had been made a ward, subject to a limited guardianship, as the result of a December 4, 2015 order in which the trial court found that she was an incapacitated individual. The trial court appointed "Christopher D. Brown and/or Joelle Gurnoe" as limited coguardians for Brown.[1] The order provided that the coguardians would only have the following powers: "[l]iving environment," "medical care," and to protect Brown "from exploitation and manipulation from others, which includes access of Kathleen Baxter or Michael Rudy" to Brown. On February 1, 2016, the trial court also appointed Gurnoe as Brown's conservator.
Aware that Rudy was spending time with Brown and that he had made several attempts to insinuate himself into her financial affairs-pitching his consulting services to Brown's son, Brown's lawyer, and then to Brown herself when the others had rebuffed his offers to work on Brown's estate monies-Gurnoe arranged a meeting with Rudy in order to assess the situation.[2] Following that meeting, Gurnoe sent a letter to Rudy on January 21, 2016. She informed him that she and Christopher had worked closely together to gain a deeper understanding of Brown's "needs and supports, and to make decisions with her safety being a top priority." Gurnoe continued, "At this time, we respectfully request that you cease all contact with Kay ...." The letter further stated: "We are hopeful that you will respect our wishes as Kay's Guardians. However, if you are unable to seamlessly remove yourself from Kay's life, we will avail ourselves of all legal remedies, including pursuit of a personal protection order or restraining order." Rudy responded with a letter of his own on February 2, 2016, in which he indicated that "[a]s an act of civil disobedience-I may choose to not comply with your edict and have my case finally heard before a real judge."
On July 13, 2016, Gurnoe, acting as Brown's next friend, filed a petition for a PPO. The petition contended that Rudy and Brown "have or had a dating relationship" and that a PPO was needed because "Ms. Windram Brown is a vulnerable adult *926 with Alzheimer's. Mr. Rudy has exerted control over her and exploited her. He has been asked to stop, and did for a while. Now he has changed the passwords on her accounts and has reinserted himself into her daily life." Gurnoe asked the court for a PPO prohibiting Rudy from entering onto the property where Brown lives, stalking her as defined under MCL 750.411h and MCL 750.411i, and accessing Brown's personal accounts online. She requested an ex parte order and accompanied her petition with two affidavits in support, her own and one written by Brown's son Soren Windram. The trial court issued an ex parte PPO on July 14, 2016. On July 25, 2016, Rudy moved to terminate the PPO. He contended that the allegations made against him were "[f]alse, erroneous and distorted."
At an evidentiary hearing that spanned three days, the trial court took testimony from Gurnoe, Windram, Rudy, Baxter, Brown, Milagros Paredes (telephonically), Fiona Gray (telephonically), and Michele Pingel.[3] At the conclusion of the evidentiary hearing, the trial court noted that it had put a professional guardianship in place to protect Brown because she "could not be kept safe by any other options." The court noted that it was a highly contentious guardianship and that Gurnoe "has not [sic] dog in this fight when she comes in, and she has a background in social work as well." The trial court noted, and it was undisputed, that Rudy continued to have contact with Brown despite Gurnoe's instructions in January 2016 to stop doing so. The court acknowledged Brown's testimony that she wanted to have contact with Rudy, but the court also noted that Gurnoe had been appointed to protect Brown. Without making any findings of fact on the record, the trial court concluded: "I am not going to terminate the personal protection order. The personal protection order is going to remain in place."
II. ANALYSIS
At the heart of this case is whether the trial court erred by continuing the PPO, which was entered pursuant to MCL 600.2950. MCL 600.2950(1) provides, in pertinent part:
Except as provided in [ MCL 600.2950(27) and (28) ],[4 ] by commencing an independent action to obtain relief under this section, by joining a claim to an action, or by filing a motion in an action in which the petitioner and the individual to be restrained or enjoined are parties, an individual may petition the family division of circuit court to enter a personal protection order to restrain or enjoin a spouse, a former spouse, an individual with whom he or she has had a child in common, an individual with whom he or she has or has had a dating relationship, or an individual residing or having resided in the same household as the petitioner from doing 1 or more of the following:
(a) Entering onto premises.
* * *
(i) Engaging in conduct that is prohibited under section 411h or 411i of the Michigan penal code, 1931 PA 328, MCL 750.411h and 750.411i.
* * *
(k) Any other specific act or conduct that imposes upon or interferes with *927 personal liberty or that causes a reasonable apprehension of violence.
Pursuant to MCL 600.2950(4), the trial court must issue a PPO "if the court determines that there is reasonable cause to believe that the individual to be restrained or enjoined may commit 1 or more of the acts listed in subsection (1)." "The petitioner bears the burden of establishing reasonable cause for issuance of a PPO and of establishing a justification for the continuance of a PPO at a hearing on the respondent's motion to terminate the PPO." Hayford v. Hayford , 279 Mich. App. 324, 326, 760 N.W.2d 503 (2008) (citations omitted). "In determining whether good cause exists, the trial court is required to consider '[t]estimony, documents, or other evidence' and '[w]hether the individual to be restrained ... has previously committed or threatened to commit 1 or more of the acts listed in subsection (1).' " Pickering v. Pickering , 253 Mich. App. 694, 701, 659 N.W.2d 649 (2002) (alterations in original), quoting MCL 600.2950(4)(a) and (b).
Although the PPO petition sought to enjoin conduct falling under Subdivisions (a), (i), and (k) of MCL 600.2950(1), it appears that the trial court only relied on Subdivision (i) in continuing the PPO following the evidentiary hearing. Furthermore, the parties' arguments on appeal are only directed at this subdivision. MCL 750.411h(2)[5] makes it a crime to engage in "stalking." MCL 750.411h(1) provides the following pertinent definitions:
(a) "Course of conduct" means a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose.
(b) "Emotional distress" means significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling.
(c) "Harassment" means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.
(d) "Stalking" means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.
(e) "Unconsented contact" means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:
(i ) Following or appearing within the sight of that individual.
(ii ) Approaching or confronting that individual in a public place or on private property.
(iii ) Appearing at that individual's workplace or residence.
(iv ) Entering onto or remaining on property owned, leased, or occupied by that individual.
*928 (v ) Contacting that individual by telephone.
(vi ) Sending mail or electronic communications to that individual.
(vii ) Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual.
(f) "Victim" means an individual who is the target of a willful course of conduct involving repeated or continuing harassment.
Additionally, MCL 750.411h(4) provides:
In a prosecution for a violation of this section, evidence that the defendant continued to engage in a course of conduct involving repeated unconsented contact with the victim after having been requested by the victim to discontinue the same or a different form of unconsented contact, and to refrain from any further unconsented contact with the victim, gives rise to a rebuttable presumption that the continuation of the course of conduct caused the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.
This Court has stated in the context of supporting a PPO based on harassment or stalking that "[t]here must be evidence of two or more acts of unconsented contact that caused the victim to suffer emotional distress and that would cause a reasonable person to suffer emotional distress." Hayford , 279 Mich. App. at 330, 760 N.W.2d 503.
In this case, as Brown's limited guardian, Gurnoe had express legal authority to control Rudy's access to Brown for the purpose of protecting Brown.[6] It is undisputed that Gurnoe met with Rudy to evaluate his intentions and then instructed him by letter of January 21, 2016, to "cease all contact" with Brown; Gurnoe warned him that failure to comply with her instructions would result in the pursuit of a PPO. It is also undisputed that Rudy engaged in multiple acts of continuing contact with Brown after receiving Gurnoe's letter, and thus, Rudy's repeated interactions with Brown legally amounted to unconsented contacts. However, the trial court made no findings of fact as to whether Rudy's unconsented contact caused Brown to suffer emotional distress and would cause a reasonable person to suffer emotional distress. See id . Those findings would lead to a rebuttable presumption that the continuation of Rudy's course of conduct caused Brown to feel terrorized, frightened, intimidated, threatened, harassed, or molested. MCL 750.411h(4).
As an alternative approach, the trial court could have but did not address whether Rudy's unconsented conduct made Brown "feel terrorized, frightened, intimidated, threatened, harassed, or molested." See MCL 750.411h(1)(d). Because of Brown's Alzheimer's disease, the operative factual question here is likely whether Rudy's conduct in maintaining a dating relationship with Brown amounted to molestation in light of her capacity to consent. Rudy testified that he engaged in sexual relations with Brown, and the majority appears to accept without question Rudy's self-characterization as Brown's "boyfriend." However, Gurnoe testified that Brown was "[a]bsolutely not" capable of consenting to sexual intercourse because of the advanced stage of her Alzheimer's disease. Windram testified that Brown told him she felt disgusted after spending the *929 night at Rudy's house and that she began making suicidal comments after Rudy began having sex with her. Gurnoe and Windram testified regarding Brown's emotional outbursts and anxiety associated with Rudy and the actions designed to protect her from him. However, the trial court made no factual findings regarding Brown's capacity to consent to sexual relations and whether Rudy's contacts caused her to feel molested or harassed, or whether she felt harassed by her coguardians' efforts to protect her-efforts that she perceived as stymieing her personal desires. I appreciate the majority's observation that Gurnoe's appointment as a limited guardian implied that Brown retained some capacity to take care of herself, and I support the notion that Brown and other similarly situated adults should be able to exercise their freedom of association to the extent of their capacities. However, whether Brown has the capacity to consent to the type of relationship Rudy claims they share-and all that this type of relationship implies for the safety and security of a vulnerable adult-involves credibility determinations that the trial court skirted, but did not make, and that this Court should not make. The credibility of the witnesses and the reliability of their testimony are crucial in this case. We are not a fact-finding court, see Bloomfield Twp. v. Kane , 302 Mich. App. 170, 185 n. 10, 839 N.W.2d 505 (2013), and it is not our place to step into the shoes of the trial court on that front. I would vacate the trial court's order and remand for further proceedings to enable the trial court to make findings of fact on the basis of the testimony presented at the evidentiary hearing and to determine whether the facts support petitioner's entitlement to continuation of the PPO.

According to testimony in the record, Christopher is Brown's stepson. Gurnoe is an attorney with professional experience as a guardian and who previously worked as a social worker for senior citizens. She has a law degree from Wayne State University and a bachelor's degree in psychology and sociology from the University of Michigan.

At the PPO continuation evidentiary hearing, Gurnoe testified that Rudy showed up at the meeting in a three-piece suit and an "Abe Lincoln" top hat. He brought a stack of materials that he wanted to share with Gurnoe on how she could better understand the dementia process for Brown and how she could learn to work better with her. He also provided Gurnoe with a CD lecture regarding "existential existence."

The trial court heard testimony indicating that either Baxter or Rudy arranged for Gray to provide Brown with personal financial assistance and that Paredes and Pingel-Rudy's massage therapist and yoga instructor, respectively-also provide services to Brown.

Subsections (27) and (28) are inapplicable to the circumstances in this case.

MCL 750.411i, which defines the crime of aggravated stalking, is not implicated in this case because there is no evidence or argument advanced that there exists any of the additional circumstances listed in MCL 750.411i(2) that are necessary for stalking conduct to constitute aggravated stalking.

Because Gurnoe had been granted these powers as limited guardian, Gurnoe was "responsible for the ward's care, custody, and control " with respect to Brown's access to Rudy. MCL 700.5314 (emphasis added). Gurnoe had a duty to act in Brown's best interests to prevent her from being exploited or manipulated. See In re Redd Guardianship , 321 Mich. App. 398, 406-407, 909 N.W.2d 289 (2017) ; MCL 330.1602(1).